UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TOMOKAZU HIROKI, | ) | CASE NO. 1:22-CV-01614 |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| HEATHER HIROKI, | ) | **ORDER DISMISSING COMPLAINT** |
| | ) | **FOR RETURN OF CHILD PURSUANT** |
| Defendant. | ) | **TO THE HAGUE CONVENTION** |

Plaintiff, Tomokazu Hiroki, filed this action against his wife, Defendant Heather Hiroki, on September 12, 2022, for the return of their three children, A., K., and E., pursuant to the Hague Convention ("Convention") and its implementing statute, the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* ("ICARA"). (ECF No. 4). Plaintiff alleges that Defendant wrongfully removed the children from their habitual residence in Mito City, Japan on October 24, 2021, and brought them to Ashland, Ohio, United States of America, without Plaintiff's consent and in violation of his custodial rights under Japanese law. (ECF No. 4, PageID# 93). The parties conducted discovery, declined an opportunity to mediate their dispute, and presented testimony and evidence to this Court at a bench trial on July 31, 2023, which lasted one and a half days.

In lieu of closing arguments, the Court accepted post-trial briefs, which both parties timely filed. (ECF Nos. 38, 39, and 40). The parties have also stipulated to facts relevant to the parties' backgrounds. (ECF No. 29). Having reviewed the parties' testimony, exhibits admitted into evidence, stipulations of fact, and post-trial briefs, the Court finds that Plaintiff failed to establish

1

that the children were wrongfully removed from their habitual residence within the meaning of the Convention.   Therefore, the remedy of return is not available to Plaintiff, and Plaintiff's Complaint for Return of Children Pursuant to ICARA is **DISMISSED WITH PREJUDICE.**

## I.    FINDINGS OF FACT

### A.  The parties' pattern of national and international travel

Plaintiff is a Japanese national and a naturalized citizen of the United States.   (ECF No. 36, Day-1 Bench Trial Transcript, PageID# 524:19–25, 525:1–3).   He and Defendant began their romantic relationship in 2012 while they were both students studying at universities in Ohio. (ECF No. 29, Fact Stipulations, PageID# 342).   At that time, Defendant was already a mother to four children from her prior marriages, ages 12, 10, 8, and 6. (*Id.*).   In 2013, Plaintiff enrolled as a student at the Berklee College of Music in Boston, Massachusetts.  (*Id.*).   Plaintiff traveled weekly between Boston and Ashland, Ohio where Defendant owns a home.   (*Id.*; ECF No. 37, Day-2 Bench Trial Transcript, PageID# 619:24–25; 620:19–21).

The parties informed Plaintiff's parents that Defendant was pregnant with A. during the summer months of 2015 during a visit to Japan.   (ECF No. 29, PageID# 342; ECF No. 36, PageID# 372:1–7).   The parties then married in Osaka, Japan in the summer of 2015, and again in Mito City, Japan in May of 2016.   (ECF No. 29, PageID# 342.; ECF No. 36, PageID# 399:5– 6; ECF No. 37, PageID# 606:19).   A. was born in February 2016.   (ECF No. 29, PageID# 342). Plaintiff graduated from Berklee in May 2016, and from August 2016 to August 2017, lived in Ashland, Ohio with Defendant and A.

In August of 2017, Plaintiff traveled to Valencia, Spain to earn his master's degree in music production.   (*Id.* at PageID# 343).   Defendant visited Plaintiff in Spain for several weeks, but

primarily remained in Ashland, Ohio with A. and the parties' son, K., who was born in October 2017.  (*Id.*).  Plaintiff returned to Ohio for K.'s birth and again in December 2017, but otherwise lived in Spain until July 2018.  (*Id.*).  Defendant visited Plaintiff in Spain with A. and K. in the spring of 2018.  (*Id.*).  Defendant also visited Plaintiff in Spain in June 2018 with A., K., and her other children, A.M., O.M., and Nate, and stayed until July 2018, when Plaintiff graduated.  (*Id.*).  Plaintiff then accepted a fellowship at Berklee in Boston, Massachusetts, which began in August 2018.  (*Id.*).  Plaintiff again traveled between Boston and Ashland, Ohio, where Defendant and the Hiroki children continued to live.  (*Id.*).

In July 2019, Plaintiff began work at a company in Japan.  (*Id.*).  Defendant (pregnant with E. at the time), A., and K., came to stay with Plaintiff in Japan.  (*Id.*).  At first, Plaintiff, Defendant, A., and K. stayed at Plaintiff's parents' Mito City home.  (*Id.*).  The family later moved into an apartment in Tokyo.  (*Id.*).  Defendant's other children, A.M., O.M., and Nate, came to stay with the parties for two weeks while they were in Tokyo.  (*Id.*).  Dissatisfied with his job, Plaintiff resigned from his job in Tokyo.  (ECF No. 29, PageID# 343).  The parties then returned to the Mito City home with the Hiroki children for a few weeks before returning to their home in Ashland, Ohio in September 2019.  (*Id.*).  The parties' third child, E., was born in November 2019.  (*Id.*).

In December 2019, Plaintiff got a job as a translator in Cardington, Ohio—a job he kept until he moved to Japan in March 2021.  (*Id.*).  Plaintiff became a naturalized citizen of the United States in April 2021, which he testified would allow him to travel more easily between Japan and the United States.  (*Id.* at PageID# 344; ECF No. 36, PageID# 437:1–6).  He attended his naturalization ceremony in Ohio and stayed here until July 1, 2021.  (*Id.*).

3

### B.  The parties begin discussing the formation of Akey Studio and Defendant's travel to Japan during the summer of 2021

At the beginning of 2021, Plaintiff was again dissatisfied with his job and the parties began seriously discussing the formation of a business, which would eventually be called Akey Studio. (*Id.* at PageID# 343–44; Pltf. Ex. 1).   Defendant expressed concerns over basing the business in Japan with a physical geographic location; she did not want to be "stuck" in one location because of the business.   (ECF No. 36, PageID# 441:1–19; Pltf. Ex.1-16).   The parties wanted the business to have a virtual component, which would allow Defendant to leave Japan for part of the year.   (ECF No. 36, PageID# 525:5–11; ECF No. 37, PageID# 628:19–23).

At the same time, the parties also began discussing plans for Defendant to travel to Japan with A., K., and E.   (ECF No. 36, PageID# 436:1–20; Pltf. Ex. 1-7).   The parties were financially strained, however, and the travel arrangements often changed from discussion to discussion due to questions over the affordability of travel and the progression of their business plan.   (*Id.* at PageID# 436:1–14; Pltf. Ex. 1-7).   At times, Defendant discussed travelling to Japan in April and returning to Ashland, Ohio in mid-August.   (*Id.* at PageID# 436:1–2; Pltf. Ex. 1-7).   Then she proposed traveling to Japan with the Hiroki children, A.M., and O.M. in May and returning to Ohio with them in July.   (*Id.* at PageID# 445:4–8; Pltf. Ex. 1-20).   To summarize, the text messages and testimony contain numerous plans involving Defendant's travel to Japan with A., K., and E., all of which spanned only a few months, and all of which contemplated Defendant's return to Ashland, Ohio with A., K., and E.   (Pltf. Ex. 1).

Eventually, Defendant pitched the idea that the parties would travel back and forth between the United States and Japan together, staying in each country for six months at a time, to which

4

both parties agreed.  (*Id.* at PageID# 450:13–23; PageID# 451:10–25; Pltf. Ex. 1-29).  The parties' testimony does not reveal when the six-month schedule was to begin, but neither party understood, at least initially, that Defendant's travel to Japan with A., K., and E. in 2021 would be a permanent relocation of the family.  (ECF No. 36, PageID# 503:5–25; PageID# 504:1:14; ECF No. 37, PageID# 674:24–25; PageID# 675:1–6).  In a series of text messages exchanged with Plaintiff's father, Defendant was adamant that she could not—and did not wish to—permanently relocate to Japan.  (ECF No. 36, PageID# 389:10–18).

In the meantime, the parties continued discussing a visit to Japan for Defendant and the Hiroki children; Defendant suggested that they arrive in Japan over the summer and return to Ohio with Plaintiff in August.  (*Id.* at PageID# 454:4–20, Pltf. Ex. 1-35).  Defendant purchased roundtrip plane tickets for herself, A., K., E., O.M., A.M., and Nate, leaving in July and returning in August, but they could not use those tickets because Defendant's visa had not yet been approved.  (*Id.* at PageID# 471:20–25; PageID# 472:1–17; J. Exs. 24-1, 24-2).  After Defendant's visa was approved, she purchased a new set of plane tickets—one way tickets for herself, A., K., and E., and roundtrip tickets for A.M. and Nate.  (*Id.* at PageID# 481:4–25; PageID# 482:1–14; J. Exs. 24-6, 24-10; ECF No. 29, PageID# 344).  Plaintiff testified that the cost of the one-way tickets was much lower than roundtrip tickets, and money was a consistent issue for he and Defendant.  (ECF No. 36, PageID# 528:15–25; PageID# 529:4–6; J. Ex. 24-11).  A.M. and Nate were booked to return to Ohio on September 10, 2021.  (*Id.* at PageID# 481:10).

There were several notable steps that Defendant did *not* take at this time:  Defendant did not sell her Ashland, Ohio home, discontinue its utilities, or rehome her chickens, cats, or rabbits.  (ECF No. 37, PageID# 599:22–25; PageID# 600:1–8).  Instead, Defendant asked her child, O.M.,

5

to care for the home and animals while Defendant was away.  (*Id.* at PageID# 600:5–8).
Defendant also did not quit her job in the United States; she worked virtually and on an as-needed
basis.  (*Id.* at PageID# 599:12–18).  Plaintiff testified that he thought Defendant kept her home
and job "probably" because she wanted to return to Ohio.  (ECF No. 36, PageID# 527:9–20).

Between July 10, 2021, and September 10, 2021, Plaintiff, Defendant, A., K., E., A.M.,
and Nate stayed at the Mito City house. During this period, they spent time either quarantining due
to Japanese COVID-19 restrictions or engaging in activities inside or outside the home; they did
so together and/or with Plaintiff's parents.  (ECF No. 29, PageID# 344; ECF No. 36, PageID#
363:14–21; PageID# 518:2–4).  Defendant obtained a Japanese driver's license.  (ECF No. 29,
PageID# 344; ECF No. 37, PageID# 602:20–22).  She also bought strawberry plants, which she
hoped would bear fruit the following spring.  (ECF No. 37, PageID# 646:13–19).  The parties
began working on the Akey Studio website; Defendant prepared a brief personal biography stating
that she "moved to Japan the summer of 2021," which was never published to the website.  (ECF
No. 36, PageID# 489:4–13; Pltf. Ex. 1–87).

Plaintiff and his father took Defendant to Mito City Hall, where Defendant signed forms
that established her permanent residence in Japan.  (ECF No. 29, PageID# 344; ECF No. 36,
PageID# 533:14–25; PageID# 534:1–25).  The forms were in Japanese, which Defendant could
not read; Plaintiff told her that she needed to sign these documents to receive a salary from his
father's company, but did not tell her that they were intended to establish her permanent Japanese
residence.  (ECF No. 36, PageID# 533:14–25; PageID# 534:1–25; ECF No. 37, PageID# 602:13–
17).  Defendant later signed an employment agreement to become an employee of Plaintiff's
father's company.  (ECF No. 36, PageID# 392:11–21; J. Ex. 10-3).  This agreement was also

6

written in Japanese, so Defendant could not read it before signing; Plaintiff told Defendant that it, too, was necessary for Defendant to receive a salary from Plaintiff's father's company.   (ECF No. 37, PageID# 682:11–23).

### C.  The Hiroki Children's time in Japan

Defendant expressed interest in returning to Ohio with A., K., and E. on September 10, 2021 (at the same time as A.M. and Nate), but Plaintiff asked her to remain in Japan longer to work on Akey Studio; Defendant agreed.   (ECF No. 36, PageID# 516:1–17; PageID# 518:9–25).   A. and K. were enrolled in kindergarten on September 1, 2021.   (ECF No. 29, PageID# 344).   The process of enrolling A. and K. in kindergarten was significant; the parties sewed the children's school uniforms and spent hours meticulously labeling their school supplies.   (ECF No. 37, PageID# 648:1–24).   After A.M. and Nate left Japan on September 10, 2021, the parties enrolled E. in preschool.   (ECF No. 29, PageID# 344; J. Ex. 14-10).   It was around this time that A. was also enrolled in dance classes.   (*Id.*).   The parties both testified that the children were enrolled in school and daycare to allow them time to work on their business.   (ECF No. 36, PageID# 518:13–17; ECF No. 37, PageID# 608:5–7).

The parties also enrolled K. in karate lessons.   (*Id.* at PageID# 345).   Initially, K. attended these lessons for free, but as K.'s participation increased, Defendant became concerned that this activity would interfere with her ability to return with the Hiroki children to Ohio.   (ECF No. 37, PageID# 676:4–12).   Plaintiff responded that the karate lessons were already paid for, suggesting that he would continue to keep K. in karate lessons over Defendant's protest.   (*Id.*).

A., K., and E.'s enrollment in school and extra-curricular activities aside, A. and K. struggled to assimilate to Japanese life.[1]   None of the children could speak Japanese.   (ECF No. 36, PageID# 562:5–11; ECF No. 37, PageID# 610:25).   A. appeared to make friends, but suffered from headaches and cried in the evenings wanting to go "home," i.e., Ashland, Ohio.   (ECF No. 37, PageID# 609:11–25; PageID# 610:1–6; PageID# 611:8–14).   A. also video-called O.M. and Defendant's mother nightly, and engaged in prayer wishing to return to Ashland, Ohio.   (*Id.*).   K. became socially isolated, aggressive, and began acting out.   (*Id.* at PageID# 610:12–23; PageID# 611:18–25; PageID# 612:1–25; PageID# 613:1–3).   K. cried in the morning on school days and would speak over the phone to Defendant's father, with whom he shares a close relationship, to calm down before attending class.   (*Id.* at PageID# 612:4–10).

K.'s home life changed in other meaningful ways while staying in Japan.   Defendant observed Plaintiff and his parents treat K., a boy, differently than A. and E., both girls.   (ECF No. 37, PageID# 613:7–19).   Defendant testified that Plaintiff did not want K. helping Defendant wash dishes, and during a physical struggle between Plaintiff and K., Plaintiff called K. a "rat shit that clings to your mother."   (ECF No. 37, PageID# 592).   Plaintiff also began physically disciplining K., striking his back and leaving the imprint of his hand and wedding ring.   (ECF No. 36, PageID# 542; D. Ex. N).   Defendant testified that Plaintiff struck K.'s face after a verbal altercation; Defendant photographed the injury to K.'s face after this incident, but Plaintiff denies that this happened.   (ECF No. 36, PageID# 538:20–21; ECF No. 37, PageID# 591:6–10; D. Ex.

---

[1] E. was less than two-years old, and did not have the opportunity to meaningfully engage with peers.   Defendant testified that E. cried a little when she first started daycare, but eventually played with other children.   (ECF No. 37, PageID# 614:4–7).

K).   In another incident, Defendant testified that Plaintiff pushed K., causing cuts and bruising to K.'s nose and chin.   (ECF No. 37, PageID# 596:11–25; D. Exs. L, M).   Defendant again photographed K.'s injuries, and Plaintiff again denied that he caused them.   (ECF No. 36, PageID# 540:10–15).

### D. The parties disagree over whether A., K., and E. can return to Ohio, prompting Defendant to secretly bring them to the United States

As difficulty with A. and K. intensified at home, Defendant again expressed a desire to return to Ashland, Ohio with the Hiroki children.   Plaintiff told Defendant that she would not return to Ohio, and if she did, she would not take the Hiroki children with her.   (ECF No. 37, PageID# 593:23–25; PageID# 594:1–10).   The parties participated in a family meeting with Plaintiff's parents on October 12, 2021, at which they used a white board to outline Defendant's options.   (*Id.* at PageID# 491:14–24; J. Ex. 8).   The white board contained the following options, written out by Plaintiff:

1.   Keep current things (continue raising kids here together)

2.   Stay here and go back to States on kids breaks

3.   Go back to the US with kids (K., A., E.) without [Plaintiff]

4.   Go to America together (with [Plaintiff] & kids) and go back to original life

(ECF No. 36, PageID# 491:17–24; J. Ex. 8).   Initially, #2 stated that A., K., and E. would remain in Japan while Defendant returned to the United States without them; Defendant erased that option and replaced it with the #2 above.   (ECF No. 36, PageID# 492:3–9).   Plaintiff and his mother believed that they had all jointly decided on option #2.   (*Id.* at PageID# 365:21–24; PageID# 492:10–12).

9

Defendant continued pushing the issue of returning to Ashland, Ohio and told her mother that Plaintiff would not allow her to return home with A., K., and E.  (ECF No. 37, PageID# 687:5–6).  Plaintiff began taking one of the children with him when he would leave the house. (ECF No. 36, PageID# 552:2–7).  Plaintiff testified that he would not have allowed Defendant to leave Japan with the Hiroki children at this point.  (*Id.* at PageID# 553:10–12).  Defendant's mother texted Plaintiff on October 20, 2021 to convince him to allow Defendant and the Hiroki children to return to Ashland, Ohio, which angered Plaintiff.  (ECF No. 36, PageID# 544:12–25; PageID# 545:1–6; J. Ex. 17-2).  Defendant's mother also texted Plaintiff's father a similar message on October 18, 2021, which Plaintiff's father asked Plaintiff to translate for him via text. (*Id.* at PageID# 543:17–25; J. Ex. 25).  Plaintiff's father's text to Plaintiff enraged Plaintiff, who was driving Defendant and the Hiroki children to school at the time.  (*Id.* at PageID# 545:1–6; ECF No. 37, PageID# 587:11–25; PageID# 588:1–3).  Defendant testified that Plaintiff punched the car's steering wheel and drove erratically, at one point causing Defendant's seatbelt to bruise her neck and chest. (ECF No. 37, PageID# 586:8–18; D. Ex. O).

On her mother's advice, Defendant approached Plaintiff's father about the driving incident. (*Id.*).  Plaintiff and his parents discussed the incident, after which Plaintiff told Defendant that she was leaving Japan and that she would never see A., K., or E. again.  (*Id.* at PageID# 586:22–25; PageID# 587:1–2).  Later that evening, Plaintiff struck K. on the back leaving his hand and wedding ring imprint.  (*Id.* at PageiD# 587:4–6).  The same night, Defendant instructed her mother to buy plane tickets for herself, A., K., and E. to return to Ashland, Ohio.  (*Id.* at PageID# 587:6–10).

10

On October 24, 2021, Plaintiff drove Defendant, A., K., and E. to church. (ECF No. 29, PageID# 345). Defendant had worked with her church and the United States Embassy to set up transportation for herself, A., K., and E. to get from the church to the airport. (ECF No. 37, PageID# 585:19–25; PageID# 586:1–3). Defendant then returned to her home in Ashland, Ohio with A., K., and E. and filed for divorce. (ECF No. 29, PageID# 345).

### E. Witness Credibility

While both parties have reason to embellish the facts, the Court cannot reconcile at least some of Plaintiff's testimony with the parties' correspondence admitted into evidence and other evidentiary materials. In one significant example, Plaintiff testified several times that he thought Defendant had come to Japan permanently. (ECF No. 36, PageID# 489:11–13; PageID# 537:16–20; PageID# 566:12–23). But this does not align with the text Plaintiff sent to Defendant immediately after she left Japan with the Hiroki children, in which Plaintiff admits that he broke "the part of the deal by saying you can't go back with kids." (ECF No. 36, PageID# 502:20–25; PageID# 503–505:1–6; J. Ex. 18). Plaintiff made a similar statement to Defendant's mother on October 20, 2021: "Although I said yes to Heather that she could go back to the US with kids like half & half year between Japan and America, I realized it's not realistic both financially and timely." (ECF No. 688:11–21; J. Ex. 17-2). Given Plaintiff's contradictory statements, the Court has serious questions about whether Plaintiff got Defendant to bring the Hiroki children to Japan under the subterfuge that it would be temporary, knowing that his intent was to make it permanent. Defendant's testimony, on the other hand, is generally consistent with the parties' exhibits and, in the Court's estimation, provides a more accurate account of the underlying facts in this matter. The Court therefore finds Defendant's testimony more credible.

11

## II.    LEGAL STANDARD

The United States and Japan are both signatories to the Convention, which seeks "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . . ." Hague Convention on the Civil Aspects of International Child Abduction, Preamble (Oct. 25, 1980).   Article 3 of the Convention provides that a child's removal is "wrongful" when:

> a) it is in breach of the rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Id.* at Art. 3.   Thus, a party seeking a child's return under the Convention must prove, as part of his prima facie case, that "prior to the [removal], the child was habitually resident in a foreign country[.]"  *Argueta v. Argueta-Ugalde*, No. 22-12840, 2023 WL 1466820, *5 (E.D. Mich. Feb. 2, 2023), *affirmed*, 2023 WL 4635901 (6th Cir. July 20, 2023).   If the Court determines that a child has been wrongfully removed from her habitual residence, the Convention requires the Court to order that the child be returned to such State, where a decision on the child's custody may be rendered.  *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020).

"Habitual residence" is not defined by the Convention.   Instead, courts are required to engage in a fact-driven inquiry to determine the place where the child is "at home" at the time of the removal.  *Id.* at 726 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006)).   "A child's residence in another country only becomes 'habitual' when it is more than transitory, and there is some degree of integration in a social and family environment."  *Argueta v. Argueta-*

*Ugalde*, No. 23-1107, 2023 WL 4635901, at *5 (6th Cir. Jul. 20, 2023) (citing *Monasky*, 140 S. Ct. at 726). In the case of young children, their acclimatization to the place from which they are removed is relevant, but because young children "depend on their parents as caregivers, the intentions and circumstances of caregiving parents" are also relevant. *Id.* at 727. International courts take the same view; in *In re A*, [2013] UKSC 60, ¶ 54 (Eng.), the English Supreme Court stated that, with reference to very young children, Courts must assess the intentions and integration of a child's parents into the social and family environment of the relevant State. In *Mercredi v. Chaffe*, 2010 E.C.R. I-14309, I14379, ¶ 54–55 (Eng. & Wales), another English court explained that "the environment of a young child is essentially a family environment, determined by the reference person(s) with whom the child lives, by whom the child is in fact looked after and taken care of."

*In re A* also lists factors for the Court to consider, including "duration, regularity, conditions and reasons for the stay on the territory of a member state and the family's move to the state, the child's nationality, the place and conditions of attendance at school, linguistic knowledge and the family and social relationships of the child." *A.* at ¶ 48. Habitual residence is generally marked by an appreciable period of time in the State coupled with a settled intent to remain there. *Id.* at ¶ 44.

Yet, even parental intent to remain in a country for a limited period could result in a child's habitual residence there. Distinguishing habitual residence from temporary presence requires the Court to find a "quality of stability" within the child's life in the State. *AR v. RN*, [2014] UKSC 35, ¶ 23 (Eng.). *AR* determined the stability of the children's lives by examining their social lives, their family lives, and their general integration into their environment. *Id.* At the same time,

13

Courts may also look to the parties' last shared intent for the child's habitual residence, disregarding the parties' individual intentions after their relationship soured.  *Argueta v. Argueta-Ugalde*, No. 23-1107, 2023 WL 4635901, at * (E.D. Mich. Jul. 20, 2023) (citing *Monasky*, 140 S. Ct. at 727).

As the cases suggest, there is no one factor that determines habitual residence.   Rather, the Sixth Circuit describes a district court's inquiry as one of the "totality of the circumstances." *Argueta v. Argueta-Ugalde*, No. 23-1107, 2023 WL 4635901, at *4 (6th Cir. Jul. 20, 2023).   The Supreme Court calls this developing a sensitivity "to the unique circumstances of the case . . . informed by common sense."  *Monasky v. Taglieri*, 140 S. Ct. 719, 726 (2020).   Only by appreciating all of the facts and circumstances can this Court arrive at the place where the Hiroki children are "at home."  *See id.*   ("The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence.").

### III.   DISCUSSION

#### A.  Habitual Residence

Applying the above factors to the case at bar, A., K., and E. are habitually resident of the United States, and in particular, Ashland, Ohio.   The Hiroki children were American citizens living in Japan for three months.  (*See* ECF No. 29, PageID# 343–345).   None of the children could speak Japanese, which made forming friendships and meaningfully participating in school and in extra-curricular activities difficult.  (*See* ECF No. 36, PageID# 562:5–11; ECF No. 37, PageID# 610:25).   The parties testified that the children were enrolled in school, not because they had relocated to Japan, but to allow Plaintiff and Defendant time to work on their business.   (ECF No. 36, PageID# 518:13–17; ECF No. 37, PageID# 608:5–7).   Plaintiff's parents could not speak

14

English, likely rendering the Hiroki children's interactions with their paternal grandparents confusing.  Neither party testified that the children had other familial relationships in Japan for this Court to discuss.

There was seemingly little stability in the parties' home life in Japan as well.  Defendant repeatedly expressed a desire to return to Ashland, Ohio.  (ECF No. 36, PageID# 516:1–17; PageID# 518:9–25; ECF No. 37, PageID# 593:24–25).  A. and K. cried before bed and before school, necessitating regular contact with family members in Ohio in whom they found comfort.  (ECF No. 37, PageID# 609:11–25; PageID# 610:1–6; PageID# 611:8–14; PageID# 612:4–10).  Plaintiff's parenting of K. suddenly involved physical discipline, causing K. to lash out at home.  (*See* ECF No. 36, PageID# 542; ECF No. 37, PageID# 610:12–23; PageID# 611:18–25; PageID# 612:1–25; PageID# 613:1–3; D. Ex. K–N).  The parties' business was seemingly stagnant despite their paychecks from Plaintiff's father's company.  When A., a 5-year-old and the eldest Hiroki child, sought stability, she asked to go "home"—to Ashland, Ohio.  (ECF No. 37, PageID# 611:8–14).

Since the children were quite young in 2021—A. was 5, K. was 3, and E. was less than 2—the Court also looks to the parties' last shared intent for the children's residence.  Here, the parties' last shared intent was that the children would return to the United States and live in Ashland, Ohio, although the timing of those travel plans was never firmly established.  (ECF No. 36, PageID# 450:13–23; PageID# 451:10–25; Pltf. Ex. 1-29).  Plaintiff agreed to Defendant and the Hiroki children returning to the United States, though he later changed his position once they were a captive audience in Japan.  (ECF No. 688:11–21; J. Ex. 17-2).  Defendant likewise stated that she did not plan to move to Japan permanently.  (ECF No. 36, PageID# 389:10–18).  Defendant's

15

decision to obtain her driver's license, grow strawberries, or sign documents to establish her residency—documents which she could not read because they were written in Japanese and which Plaintiff did not fully explain to her—does not alter the Court's analysis.  Defendant's driver's license and strawberry plants are dwarfed by the amount of evidence and testimony supporting her intent to leave Japan in 2021.  On the other hand, Plaintiff's failure to fully explain the residency and employment documents, thereby obtaining Plaintiff's signature, is consistent with his later coercive behavior; Plaintiff tried to keep Defendant from leaving Japan, either by taking one of the children with him when he left the house, or by threatening Defendant that if she left Japan, she would never see the Hiroki children again.  (ECF No. 36, PageID# 552:2–7; PageID# 553:10–12; ECF No. 37, PageID# 593:23–25; PageID# 594:1–10).  The product of these overt and covert pressure tactics—keeping Defendant and the Hiroki children in Japan—does not inure to Plaintiff's benefit.

The parties' pattern of practice is also relevant.  *Argueta v. Argueta-Ugalde*, No. 23-1107, 2023 WL 4635901, at * (E.D. Mich. Jul. 20, 2023).  While Plaintiff moved all over the world—from Ohio to Boston to Spain to Japan—Defendant, A., K., and E. lived in Ashland, Ohio.  (ECF No. 29).  Each time that Defendant traveled to visit Plaintiff when he lived abroad, she brought the Hiroki children with her, and returned from those visits to their family home in Ashland, Ohio with the Hiroki children.  (*Id.*).  Defendant testified that her July 2021 visit to Japan was meant to be similar; although the parties were in the process of starting a business, Defendant had been unequivocal that she intended to return to Ohio in 2021, and the parties' practice had always been for Defendant to travel with A., K., and E.  (ECF No. 37, PageID# 675:1–6).  The Court can only conclude, based on the parties' past conduct, that Defendant's return to Ashland, Ohio was

16

intended to include A., K., and E.   S*ee Robert v. Tesson*, No. 1:04-CV-333, 2005 WL 1652620, at *20 (S.D. Ohio, June 29, 2005) (finding habitual residence in the United States because, *inter alia*, "[w]hen the couple was not together, they saw fit to have the children reside with [their mother] in the United States").

Even if the parties intended to have homes in both Japan and the United States, a comparison of the children's lives in Japan and the United States produces the same results.   *See Jenkins v. Jenkins*, 569 F.3d 549, 557 (6th Cir. 2009) (explaining that a comparison of multiple countries of residence is only appropriate where the children live in each country for extended periods of time and "maintained contacts and possessions in each country").   The Hiroki children's connections to Ohio are stronger than those connections they formed in Japan; as explained in detail above, A. and K. participated in school and extracurricular activities in Japan, but the majority of their familial relationships were in Ohio.   Both A. and K. regularly engaged in video calls with O.M. and Defendant's parents.   Apart from their three months in Japan, the Ashland, Ohio home was the only home these children ever knew, and it was the home they returned to again and again while Plaintiff lived abroad.   Defendant was also inextricably tied to Ashland, Ohio, not only by virtue of her home and job, but by her children O.M., A.M., and Nate, all of whom live in Ohio.   A finding that A., K., and E. are habitually resident anywhere other than Ashland, Ohio, United States would require the Court to bend or break away entirely from the context of nearly every fact before it.

The Court concludes, based upon the totality of the evidence before it, that A., K., and E. are habitual residents of Ashland, Ohio, United States.   Further analysis of Plaintiff's Complaint is therefore conducted with Ohio as the Hiroki children's habitual residence.

**B. Wrongful Removal**

As previously explained, Article 3 of the Convention states that the removal of a child is wrongful when "it is in breach of the rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention." Hague Convention on the Civil Aspects of International Child Abduction, Art. 3 (Oct. 25, 1980). The Court has determined that the United States, and specifically, Ohio, was A., K., and E.'s habitual residence when they were removed from Japan.

Ohio Rev. Code Ann. § 2111.08 provides, in relevant part:

> The wife and husband are the joint and natural guardians of their minor children and are equally charged with their care, nurture, welfare, and education and the care and management of their estates. The wife and husband have equal powers, rights, and duties and neither parent has any right paramount to the right of the other concerning the parental rights and responsibilities for the care of the minor or the right to be the residential parent and legal custodian of the minor, the control of the services or the earnings of such minor, or any other matter affecting the minor . . . .

Thus, Defendant had the right to take the Hiroki children back to their habitual residence, which merely impacted Plaintiff's right to access the children, not his custodial rights. *See Jenkins v. Jenkins*, 569 F.3d 549, 555 (6th Cir. 2009). A family court in Ohio will ultimately review Defendant's decision to relocate A., K., and E. and determine appropriate custody of the children. *See Argueta v. Argueta-Ugalde*, No. 22-12840, 2023 WL 1466820, at *9 (E.D. Mich. Feb. 2, 2023). Accordingly, Defendant's transfer of the children from Japan to the United States did not violate Plaintiff's custodial rights, and his Complaint for return of the children must be dismissed.

18

IV.     **CONCLUSION**

The totality of the circumstances reveals that the Hiroki children were "at home" and, thus, habitually resident in Ashland, Ohio when they were removed from Mito City, Japan and taken back to Ashland, Ohio in the United States.  Such removal from Japan by Defendant was not "wrongful" within the meaning of the Convention and, therefore, the remedy of return is not available to Plaintiff.   Therefore, Plaintiff's Complaint must be **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

**October 12, 2023**

_____
**CHARLES E. FLEMING**
**U.S. DISTRICT COURT JUDGE**

19